UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

JOSE J. SANTIAGO,

                    Petitioner,

          -v-                                    08-CV-6465(MAT)
                                                 **ORDER**
HAROLD D. GRAHAM, Superintendent of
Auburn Correctional Facility,

                    Respondent.

─────────────────────────────────

## I.    Introduction

        Petitioner, who is represented by counsel, has filed a timely
petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254
challenging his conviction in Monroe County Court of, *inter alia*,
Murder in the First Degree. Petitioner was convicted on June 8,
2000, following a jury trial before Judge William H. Bristol.
Petitioner is currently serving a sentence of life imprisonment
without parole.

## II.   Factual Background and Procedural History

        Petitioner's conviction stems from the execution-style
slayings of a two-year old and a fourteen-year old boy and the
shootings and repeated stabbings of three women on Remington Street
in the City of Rochester in the course of a robbery at that
location on March 1, 1999.  The three surviving victims were
Bernetta Wims ("Wims") and her two daughters, Chaquita and
Shuntavia.

Petitioner was indicted in Monroe County under Indictment No. 210/1999, charging him with four counts of Murder in the First Degree (N.Y. Penal L. § 125.27(1)(a)(vii) & (b), 125.27(1)(a)(viii) & (b)); two counts of Murder in the Second Degree (N.Y. Penal L. § 125.25(3)), and three counts of Attempted Murder in the First Degree (N.Y. Penal L. §§ 110.00, 125.27(1)(a)(vii) & (b)). See Respondent's Appendix ("Appx.") B at 6.

The evidence was uncontroverted that all of the victims, except the two-year-old, had been bound, forced to the floor, blindfolded, stabbed, and shot. Petitioner, represented by the Capital Defender Office, asserted that he was either misidentified or falsely accused by the surviving victims.

Following a jury trial in Monroe County Court, he was convicted on all counts on June 8, 2000. T. 4004-4006.[1] Because the first-degree murder charges carried potential death penalty sentences, a penalty phase hearing was held before the same jury, which returned verdicts of life imprisonment without parole. See Mins. dated 6/23/2000 at 767-768. On July 10, 2000, petitioner was sentenced by the court to aggregate terms of imprisonment, the longest of which being life without parole. S. 22-26.

Petitioner appealed the judgment of conviction to the Appellate Division, Fourth Department, raising the following points for review: (1) illegal search and seizure; (2) petitioner's

---

[1] Citations to "T.__" refer to the trial transcript; citations to "S.__" refer to the sentencing transcript.

sentences were imposed pursuant to an unconstitutional deadlock jury instruction; (3) denial of a fair trial due to prosecutor's comments on summation; (4) the introduction of autopsy photographs deprived petitioner of a fair trial; (5) the trial court abused its discretion in precluding testimony that one of the victims was involved in drug activity; (6) petitioner's statements to police were the product of an arrest without probable cause; (7) petitioner's confessions should have been suppressed; (8) petitioner made a *prima facie* showing of gender discrimination in jury selection; (9) the lower court erred in imposing consecutive sentences; and (10) the convictions for second-degree felony murder should be dismissed as inclusory, concurrent counts of first-degree felony murder. Appx. A. The Appellate Division unanimously modified the judgment, reversing the convictions for Murder in the Second Degree and vacating the sentences imposed for Murder in the First Degree, and affirming the judgment as modified. People v. Santiago, 41 A.D.3d 1172 (4th Dept. 2007). The appellate court remitted the case to Monroe County Court for resentencing on the first-degree murder counts, id. at 1173, and on August 22, 2007, petitioner was resentenced to life imprisonment without parole on those convictions.

Petitioner then sought leave to appeal to the New York Court of Appeals on grounds (1), (3), (5), (7), and (8) above. Appx. H.

Leave was denied on October 16, 2007. <u>People v. Santiago</u>, 9 N.Y.3d 964 (2007).

The instant petition for habeas corpus was filed with this Court on October 14, 2008, raising the following grounds for relief: (1) petitioner was denied his right to be free from illegal searches and seizures; (2) the prosecutor's comments on summation deprived petitioner of a fair trial; (3) petitioner was denied his right to a fair trial because the admission of the autopsy photos inflamed the jury; (4) petitioner was denied the right to a fair opportunity to defend himself when the trial court precluded a victim's testimony relating to her drug activity; (5) petitioner's statements to police were the product of an arrest without probable cause; (6) petitioner's confessions were elicited in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); and (7) petitioner made a *prima facie* showing of gender discrimination during jury selection. <u>See</u> Petitioner's Memorandum of Law ("Pet'r Mem.") at 1-78.

For the reasons that follow, I find that petitioner is not entitled to the writ, and the petition is dismissed.

## III. Discussion

### A.   General Principles Applicable to Federal Habeas Review

#### 1.   Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal

constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. See 28 U.S.C. § 2254(d)(1), (2); Williams v. Taylor, 529 U.S. 362, 375-76 (2000).

### 2. Exhaustion Requirement and Procedural Default

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Att'y General, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), cert. denied, 464 U.S. 1048 (1984).

28 U.S.C. § 2254(b)(1)(A) requires a petitioner "[to] give the state courts one full opportunity to resolve constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 842. This includes filing an application for discretionary appellate review with the State's highest court if that right is available by

statute. Id. at 845; accord Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000).

However, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.'" Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (quoting Harris v. Reed, 489 U.S. 255, 263 n.9 (1989); other citations omitted). Under such circumstances, a habeas petitioner "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. Section 2254(b)." Grey, 933 F.2d at 120. The procedural bar that gives rise to the finding that the claim should be deemed exhausted works a forfeiture and precludes litigation of the merits of the claim absent a showing of cause for the procedural default and prejudice resulting therefrom or by demonstrating that failure to consider the claim will result in a fundamental miscarriage of justice, i.e., that the petitioner is actually innocent. See Coleman v. Thompson, 501 U.S. 722, 748 (1991); Murray v. Carrier, 477 U.S. 478, 496 (1986).

**B. Merits of the Petition**

**1. Ground (1), alleging a Fourth Amendment violation, is not cognizable on habeas review.**

Petitioner contends that his conviction was unlawful because it was obtained by the use of evidence gained pursuant to an unconstitutional search and seizure. Pet'r Mem. at 2-18.

In general, state court defendants are barred from obtaining habeas relief based upon Fourth Amendment claims. "Where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494, (1976) (footnotes omitted). The Second Circuit has noted that Stone requires only that "the state have provided the *opportunity* to the state prisoner for full and fair litigation of the Fourth Amendment claim." Gates v. Henderson, 568 F.2d 830, 839 (2d Cir. 1977) (en banc), cert. denied, 434 U.S. 1038 (1978) (emphasis added). A federal court may undertake habeas review only in one of two instances: (1) "if the state provides no corrective procedures at all to redress Fourth Amendment violations," or (2) if "the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process . . . ." Id. at 840; accord Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

A petitioner receives a "full and fair opportunity" to litigate his Fourth Amendment claim where the state provides a "'statutory mechanism' for suppression of evidence tainted by an unlawful search and seizure." McPhail v. Warden, Attica Corr. Facility, 707 F.2d 67, 69 (2d Cir. 1983). Here, New York clearly affords defendants the requisite corrective procedures. See N.Y.

Crim. Proc. L. § 710.10 et seq.; see also Capellan, 975 F.2d at 70

(noting that "federal courts have approved New York's procedure for

litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc.

Law § 710.10 et seq. (McKinney 1984 & Supp.1988) as being facially

adequate"). Thus, Petitioner may not raise his Fourth Amendment

claim on habeas review because he was provided with the opportunity

to fully adjudicate these matters in state court.

Although there is a possibility that habeas relief may be

available on a Fourth Amendment claim "if the state has provided a

corrective mechanism, but the defendant was precluded from using

that mechanism because of an unconscionable breakdown in the

underlying process," Cappellan, 975 F.3d at 70, there was no such

unconscionable breakdown present on this record. Petitioner filed

extensive pretrial motions seeking suppression and was accorded a

full and fair hearing after which the county court issued a 64-page

written decision denying suppression with one exception. Appx. B.

15-60, 344-357, 418-83. Petitioner thus does not make any claim

that would fall within the exception that would permit habeas

review of his Fourth Amendment challenge, and this ground for

relief does not support issuance of the writ.

Accordingly, the claim must be dismissed.

### 2. Grounds (3) and (5) are unexhausted and procedurally defaulted.

Petitioner alleges that the trial court erred in admitting the

victims' autopsy photos and that his statements to police were the

result of an illegal arrest. Pet'r Mem. 30-39, 44-58. He did not, however, pursue those claims in his application for leave to appeal to the New York Court of Appeals, and thus failed to properly exhaust those claims by presenting them to the state's highest court. <u>See</u> Appx. H; <u>Grey v. Hoke</u>, 933 F.2d 117, 119 (2d Cir. 1991) ("Under 28 U.S.C. § 2254(b), applicants for habeas corpus relief must 'exhaust[ ] the remedies available in the courts of the State.' In doing so, a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition.") (quoting <u>Pesina v. Johnson</u>, 913 F.2d 53, 54 (2d Cir. 1990) (per curiam)).

The claims, however, must be deemed exhausted because petitioner would face an absence of corrective process were he to return to state court in an attempt to exhaust them. State appellate review is no longer available to petitioner; he cannot again seek leave to appeal the claim in the Court of Appeals because he has already made the one request for leave to appeal to which he is entitled. <u>See, e.g.</u>, N.Y. Court Rules § 500.20. Moreover, collateral review of these claims is also barred because the issues were previously determined on the merits on direct appeal. <u>See</u> N.Y. Crim. Proc. L. § 440.10(2)(a); <u>see also</u> <u>id.</u> § 440.10(2)(c) (barring review if a claim could have been raised on direct review); <u>accord</u>, <u>Grey</u>, 933 F.2d at 120-21. The state procedural rules that give rise to the constructive exhaustion of

this claim also render the claim procedurally defaulted. See, e.g., Ramirez v. Att'y General of N.Y., 280 F.3d 87, 94 (2d Cir. 2001) ("Even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law.") (citing Grey, 933 F.2d at 120-21).

A finding of procedural default bars habeas review of his federal claims unless petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the claims will result in a miscarriage of justice. Murray v. Carrier, 477 U.S. 478, 492 (1986); Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977). Petitioner makes no showing of cause and prejudice or that this Court's failure to review the claims will result in a miscarriage of justice, i.e., that he is actually innocent of the crimes for which he has been convicted. See Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002). These claims are therefore dismissed as procedurally barred.

### 3. Petitioner's remaining claims fail on the merits.

#### a. Prosecutorial Misconduct

Petitioner contends that he was deprived of his right to a fair trial because of the prosecutor's conduct on summation. Pet'r Mem. 19-29. The Appellate Division concluded,

> [T]he comments of the prosecutor on summation were fair comment on the evidence and did not exceed the broad bounds of rhetorical comment permissible in closing argument. In any event,

> even assuming, arguendo, that the prosecutor
> engaged in misconduct during his summation, we
> conclude that such misconduct was not so
> egregious as to deprive defendant of a fair
> trial.

Santiago, 41 A.D.3d at 1175 (quoting People v Williams, 28 A.D.3d 1059, 1060 (4th Dept. 2006), aff'd, 8 N.Y.3d 854 (2007)).

During his opening statement, defense counsel remarked that petitioner, like any other person, was entitled to have the prosecution held to their burden of proving guilt beyond a reasonable doubt. To emphasize this point, counsel stated, "Jose is not a hero, he's not a saint. You know, he's just a person like you and me. He's not a thing, you know . . . . And he's a person whose future, quite literally, his life is in your hands." T. 528. In addressing these remarks toward the end of his summation, the prosecutor stepped away from the podium and said to a juror, "Ms. Murphy, this defendant is not like you and me," to which the juror responded, "no" after a brief pause. In addition, the prosecutor placed on the visualizer a crime scene photograph of one of the victims. T. 3781. The court overruled defense counsel's objection that the remark and the photographs were inflammatory to the jury and prejudicial. Id. The court then directed the prosecutor to "address the panel." The prosecutor continued with this theme, arguing to the jury that, "this defendant is not like you or me," and recounted the allegations that petitioner bound, stabbed, and shot three female victims, and executed two young

boys. He concluded, "This defendant is not a saint. He is no hero. He's a coward and a murderer. He must answer now for what he did." T. 3782.

Defense counsel moved for a mistrial immediately following the prosecution's summation on the grounds that the prosecutor's remarks were inflammatory and sought to "demonize and villianize" the petitioner. In addition, counsel argued that the prosecutor improperly addressed a single juror when he addressed her by name. T. 3789. The trial court responded by obtaining a transcript of the relevant portion of the summation to ascertain whether the prosecutor had expressly questioned the foreperson during summation, and conducted an *in camera* inquiry of the juror concerning the incident. In denying the mistrial motion, the trial court found that the juror's exclamation was a startled response upon hearing her name called, and that the prosecutor did not ask a question of the juror, but rather made a statement with the juror's name appended. T. 3820-3833.

In order to obtain habeas relief based upon the misconduct of a prosecutor, "[i]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). Rather, a constitutional violation will be found only when the prosecutor's remarks "'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'" <u>Gonzalez v. Sullivan</u>, 934 F.2d 419, 424 (2d Cir. 1991)
(quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).
Moreover, a prosecutor's remarks during summation are grounds for
reversal "only when the remarks caused 'substantial prejudice' to
the defendant." <u>Id.</u> (citations omitted). Whether the comments
caused substantial prejudice to the petitioner is to be assessed by
considering "'the severity of the misconduct; the measures adopted
to cure the misconduct; and the certainty of conviction absent the
improper statements.'" <u>Floyd v. Meachum</u>, 907 F.2d 347, 355 (2d Cir.
1990) (quoting <u>United States v. Modica</u>, 663 F.2d 1173, 1181 (2d
Cir. 1981), <u>cert. denied</u>, 456 U.S. 989 (1982)).

As petitioner has pointed out, it is an unacceptable practice
for the prosecutor to have singled out one juror by name. <u>See</u>
<u>People v. Jones</u>, 71 A.D.2d 553 (1st Dept. 1979). However, "[a]
criminal conviction will not be overturned on the basis of a
prosecutor's remarks in an otherwise fair proceeding." <u>Gatto v.</u>
<u>Hoke</u>, 809 F.Supp. 1030, 1040 (E.D.N.Y. 1992) (citing <u>United States</u>
<u>v. Young</u>, 470 U.S. 1 (1985)). The record reflects that the
prosecutor made a statement in response to defense counsel's
opening statement, and did not pose a question directly to the
juror. The trial court then took steps to ensure that the juror
was able to remain fair and impartial by conducting an *in camera*
hearing, in which the juror acknowledged that she was not making an
expression of opinion, but was simply startled to hear her name

called. Most importantly, in light of the overwhelming evidence against the petitioner, the prosecutor's statement was not so prejudicial as to have rendered the entire trial fundamentally unfair. Accordingly, the error here was not of such character or extent as to warrant habeas relief. See, e.g., Bacchi v. Senkowski, 884 F.Supp. 724, 733 (E.D.N.Y.1995) (denying habeas corpus petition where during summation, the prosecutor, on the verge of tears, addressed a juror by name, referred to the jurors' fear of guns, characterized the defendant as a "sick man" and begged the jury to convict the petitioner).

Petitioner also complains that the prosecutor "repeatedly commented that Mr Santiago was not a person like him or the jurors," Pet'r Mem. at 23. The record indicates that defense counsel sought to portray petitioner as an ordinary young man who had been wrongly accused by Bernetta Wims. In response, the prosecutor provided a detailed review of the evidence, stating that a person that would execute two children and repeatedly shoot and stab three women was not "like you and me." Such comments are not necessarily improper as a matter of federal law. See Young, 470 U.S. at 11-13 (explaining the "invited response" rule; in properly assessing a claim of prosecutorial misconduct, "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo."); Darden, 477 U.S. at 182 (finding no substantial prejudice, in part

because "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense"); United States v. Rivera, 971 F.2d 876, 883 (2d Cir. 1992) ("The prosecutor's remarks were legitimate responses to counsel's arguments that [defendant] had, in essence, been framed by the cooperating witnesses and the government. The challenged statements were an attempt to focus the jury's attention upon the evidence and away from defense counsel's claims.").

Accordingly, I find that the Appellate Division's rejection of petitioner's prosecutorial misconduct claim was not contrary to or an unreasonable application of federal law and this claim must therefore be dismissed.

### b. Right to Present a Defense

Petitioner claims that his right to present a defense was unduly abridged when the trial court precluded questioning of Bernetta Wims concerning her involvement in drug activity. Pet'r Mem. 39-43. The Appellate Division summarily rejected this contention as "without merit." Santiago, 41 A.D.3d at 1176.

### i. Cross-examination of Bernetta Wims

At petitioner's trial, defense counsel asked Wims a series of questions regarding her involvement in drug dealing and whether she was acquainted with the petitioner through drug activity. He further inquired about the large quantity of valuables found inside of Wims' home, including two computers, a television set in every

room and expensive jewelry, despite the fact that she received public assistance and was unemployed. The prosecutor objected on the ground that a person being on public assistance did not "go to one's credibility." T. 1560-1561. Defense counsel argued that, in questioning Wims about her apparent lack of legitimate income, he sought to bring out testimony "indicating that she does sell drugs or that she has other sources of income." Id. He did not, however, specifically alert the trial court that his line of questioning would develop the claim that a third person was involved in the crime. See, e.g., People v. Primo, 96 N.Y.2d 351 (2001) (discussing the proper analytical approach in determining admissibility of third-party culpability evidence). The trial court permitted counsel to cross-examine Wims regarding her prior bad acts, including an alleged petit larceny from a grocery store where Shuntavia was employed, but did not allow counsel to further question Wims about her or Shuntavia's employment history. T. 1564-1569, 1715-1720.

## ii. Applicable Case Law

The right to present a defense is a fundamental right guaranteed by the Sixth and Fourteenth Amendments. See Gillmore v. Taylor, 508 U.S. 333, 343 (1993) (citing Crane v. Kentucky, 476 U.S. 683, 690 (1986)); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against

the State's accusations."); <u>Wade v. Mantello</u>, 333 F.3d 51, 57 (2d Cir. 2003) ("Supreme Court precedent makes clear that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense.").

That right, however, is not without limitations. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988); <u>accord</u> <u>Chambers</u>, 410 U.S. at 302; <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326 (2006) ("[w]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"); <u>Wade</u>, 333 F.3d at 58 ("The power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled."); <u>Washington v. Schriver</u>, 255 F.3d 45, 56 (2d Cir. 2001) (same). "Nevertheless, state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness." <u>Washington</u>, 255 F.3d at 56.

In determining whether the exclusion of evidence violated a defendant's right to present a defense, a court must first determine whether the trial court's evidentiary ruling was proper. If it was not, the court must then determine "whether the omitted evidence [evaluated in the context of the entire record] creates a

reasonable doubt that did not otherwise exist." Wade, 333 F.3d at 59 (internal quotation marks omitted) (quoting Justice v. Hoke, 90 F.3d 43, 47 (2d Cir. 1996) (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)).

Under New York law, evidence is relevant if it tends to prove the existence or non-existence of a material fact, but "a court may, in its discretion, exclude relevant evidence if its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues, or misleading the jury." Primo, 96 N.Y.3d at 355. Evidence "of merely slight, remote or conjectural significance" will ordinarily be insufficiently probative to outweigh these countervailing risks. Id. at 355-356. In Primo, on which petitioner relies, the New York Court of Appeals found that evidence of third-party culpability was relevant and admissible where a ballistics report linked a known third person to the gun used to shoot the victim, and there was proof that the third person also was at the scene of the shooting of which the defendant was accused. 96 N.Y.2d at 357.

Here, the trial court's refusal to allow evidence of Wims' and her family's employment did not improperly thwart his effort to develop a claim of third-party culpability. Counsel was permitted to ask extensive questions regarding Wims' belongings and allegations of drug activity, in addition to questions relating to Wims' and Shuntavia's prior bad acts. Counsel did not, however,

make any further showing that would have strengthened his defense that another person was the attacker. Unlike the defendant in Primo, petitioner named no potential third person, instead setting forth a chain of inferences suggesting that if Wims were involved in drug dealing, then a person other than petitioner may have had motive to rob and shoot her and her family, and that such a third-person may have been responsible for the attacks. It is well-settled that "'[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved' to show that someone other than the defendant committed the crime." People v. Schulz, 4 N.Y.3d 521, 529 (2005) (quoting Greenfield v People, 85 N.Y. 75, 89 (1881)). Thus, even if petitioner had specifically raised the argument of third-party culpability, the trial court would not have erred in precluding the testimony as too speculative to have any probative value. Accordingly, Appellate Division's decision affirming the propriety of trial court's evidentiary was not contrary to, or an unreasonable application of Supreme Court precedent. This claim is therefore dismissed.

### c. **Miranda** Violation

Petitioner claims that his confessions to the murders and attempted murders were obtained in violation of his Fifth Amendment right against self-incrimination.[2] Pet'r Mem. 58-69. Specifically, petitioner avers that his preliminary, unwarned statements to

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

police regarding his drug use and his subsequent, Mirandized confessions were part of a "single, continuous chain of events" and thus his confessions should have been suppressed. Id. at 58. On this point, the Appellate Division held,

> [W]e reject the contention of defendant that his statements to the police should have been suppressed because, before he was advised of his Miranda rights, he told them that he had previously sold drugs. That statement does not require suppression of the post-Miranda statements because it was nonresponsive to the officer's question that immediately preceded the statement concerning the drugs and thus was spontaneous. Furthermore, the officer's question was permissible because its purpose was to determine whether defendant was under the influence of drugs. The question was "similar to pedigree questions or those necessary for providing for defendant's physical needs and clearly w[as] not for the purpose of attempting to inculpate him."

Santiago, 41 A.D.3d at 1174-1175 (internal quotations and citations omitted).

### i. Suppression Hearing

After having been identified by two of the surviving victims, petitioner was taken to the Public Safety Building in Rochester.[3] There, he was met by two investigators from the Rochester Police Department dressed in business attire. The investigators introduced themselves and asked whether petitioner needed anything. Petitioner replied that he was hungry, and the two investigators left to order food. When they returned, petitioner was taken to another interview

---

[3] It is not disputed that petitioner was in custody while he was at the Public Safety Building.

room. H. 567-570.[4] Once "settled" into the second interview room, Investigator Anthony Campione ("Campione") asked petitioner several questions, including his full name, age, birthday, address, and whether he was employed. Campione also asked petitioner if he used drugs. Petitioner replied in the negative, but told the investigator that he had sold drugs in the past. Campione then asked questions regarding petitioner's ability to read and write English and his educational background. According to Campione, the investigator wanted to ascertain whether petitioner was "coherent enough" so that when Miranda warnings were administered, he was sure that petitioner was "able to understand [his rights]." Id. at 571-574.

After approximately thirteen minutes of preliminary questions, Campione then told petitioner that they wanted to talk with him about "some allegations" that had been made, but first he would need to be advised of his rights. Petitioner responded that he knew his rights, and Campione then read from a Miranda notification and waiver card.[5] Prior to the advisement of his rights, petitioner was not questioned about the incident on Remington Street. Petitioner's rights were given at 1:26a.m., and thereafter the interview concerning the crimes began.  Id. at 575-577.

---

[4] Citations to "H.__" refer to the suppression hearing minutes.

[5] The sufficiency of petitioner's Miranda warnings are not in dispute.

Initially, petitioner denied his involvement in the crimes. Around 2:00a.m., Campione left the interview room to see if there were any developments on the investigation. He learned that a handgun and a safe had been found in a fenced-in doghouse at the rear of 16 Sullivan Street, where petitioner lived. Several pieces of jewelry and other items were also found hidden behind the garage at that address. A wet load of laundry had also been found in the basement washing machine. H. 582. After the investigator informed petitioner that police had found the gun and the safe, petitioner paused and asked, "how much time does somebody get for doing something like this?"

Campione advised petitioner that they had no control over that, and that it was the investigators' job to gather the facts of what happened during the incident in question. Petitioner then began to tell investigators about the events that transpired that evening, detailing how he committed the crimes and discussed the pieces of evidence that police had collected during the search of his house. H. 584-585. He claimed that the incident had resulted from the fact that Wims owed him $13,000 for cocaine and that she pulled a knife on him. After providing his version of what had happened, his statement was reduced to writing, read back to petitioner, and petitioner stated that it was the truth. He did ask for one sentence to be taken out because he thought it made him

"sound too bad." After correcting two typographical errors, petitioner signed the statement. H. 587-598, 600-606.

Thereafter, petitioner was taken to another room to view some of the items that had been recovered from the search of his house. Beforehand, petitioner asked an investigator "if there was a death penalty in this state," because, he said, "I'm a cold blooded mother-fucking killer and I deserve to die." Petitioner then uttered something to the effect of, "that's okay. They all deserved to die too." H. 599-600.

The suppression court denied petitioner's motion of all his post-<u>Miranda</u> statements. It did suppress the pre-warned statement that petitioner had previously sold drugs. The court then determined that after petitioner knowingly and intelligently waiving his rights, his statements were given without force, coercion, or threats. Appx. B at 469-473. The Appellate Division affirmed the county court's decision, and petitioner now argues, as he did on appeal, that his post-<u>Miranda</u> statements should have been suppressed because there was no break between the pre-<u>Miranda</u> statement that he previously sold drugs and his statements relating to the crime later in the night.

### ii.  Applicable Case Law

A person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must be "warned that he has a right to

remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda</u>, 384 U.S. at 444. A statement made by a defendant following a definite, pronounced break in interrogation by the police, and preceded by <u>Miranda</u> warnings, is ordinarily admissible despite the fact that it followed a prior, inadmissible statement. The rationale for this rule is that if the subsequent statement is not the product of a single, continuous chain of events, then there is a sufficient attenuation of possible taint. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 300 (1985).

In <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), on which petitioner relies, the Supreme Court re-examined <u>Elstad</u>, in a case where law enforcement intentionally conducted an un-warned custodial interrogation in order to obtain a full confession. In <u>Seibert</u>, a police officer deliberately withheld <u>Miranda</u> warnings from a suspect following her arrest and questioned her for 30 to 40 minutes. After obtaining a confession, the officer gave her a 20-minute break, and then <u>Mirandized</u> her. Seibert waived her rights and the officer resumed questioning, to which Seibert responded by repeating the confession she gave earlier. The plurality in <u>Seibert</u> found the Mirandized statement to be inadmissible because of the "completeness and detail of the questions and answers to the first round of questioning, the two statements' overlapping

content, the timing and setting of the first and second rounds, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." 542 U.S. at 601-602. Under those circumstances, "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." Id. at 616-617.

Petitioner's reliance on Seibert is misplaced. The record is devoid of any indication of a "question first" practice proscribed by the Supreme Court. After petitioner was given his Miranda warning, the investigators' line of questioning shifted from a series of routine booking questions to questions relating directly to the crime for which petitioner had been arrested for. Campione's question concerning whether petitioner used drugs thus cannot reasonably be seen as part of a continuous chain, nor was it elicited through means that were "systematic, exhaustive, and managed with psychological skill." Siebert, 542 U.S. at 602.

Furthermore, petitioner did not make an incriminating statement prior to receiving Miranda warnings. Petitioner made his first oral confession only after he was warned by the investigators. His first series of statements were in response to

several routine booking questions[6].  The fact that petitioner stated he "used to sell drugs" was, as the appellate court observed, volunteered and not even made in response to the investigator's question. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 299-302 (1980) (stating that Miranda protections apply only when statements are made in response to express questioning or its functional equivalent).

Here there was no deliberate, two-tiered interrogation strategy present on this record, and petitioner did not make incriminating statements until after he was administered his Miranda warnings. In sum, Siebert is inapplicable to the instant case, and the Appellate Division's determination was neither contrary to, nor an unreasonable application of the precepts of Miranda v. Arizona. Habeas relief is not available to petitioner on this ground.

### d.  **Batson** Violation

Petitioner contends that he made a *prima facie* showing of gender discrimination during the jury selection portion of his trial. Pet'r Mem. 70-78. The Appellate Division held,

> Contrary to the additional contention of defendant, he failed to make the requisite prima facie showing of discrimination by the prosecutor with respect to the prosecutor's use of peremptory challenges against female

---

[6] See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (recognizing "routine booking question exception which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services" (internal quotation marks omitted)).

> prospective jurors, and thus the court
> properly denied defendant's <u>Batson</u> challenges
> without requiring the prosecutor to come
> forward with gender-neutral explanations for
> his use of those peremptory challenges.

<u>Santiago</u>, 41 A.D.3d at 1176.

### i.  Jury Selection

During the third phase of jury selection[7], defense counsel raised multiple <u>Batson</u> challenges alleging that the prosecution was using its peremptory challenges to discriminate against women, relying solely on the number of peremptory challenges exercised by the prosecution. T. 213, 357, 363, 452.

The first challenge arose after the third pass. Counsel pointed out that the prosecutor had used seven of ten peremptory strikes against women. In response, the prosecutor stated that the defense's allegation did not make the necessary showing under the first step of <u>Batson</u>. The court agreed and denied the first challenge. T. 213-214. The defense then exercised their peremptories to strike three additional women. After the third pass, five jurors had been sworn, four of them women. T. 168, 214.

Following the fourth pass, four more jurors had been sworn, three of them women. At this point, a total of seven women and two men were sworn as jurors. <u>See</u> Appx. C at 63 ("Chart 1").

---

[7] Because this was a capital case, jury selection was longer and more thorough than in a typical criminal prosecution. Accordingly, jury selection was broken down into three stages. The third stage, which spanned two days, involved consideration of 78 jurors where both sides exercised peremptory and for-cause challenges.

The second challenge by the defense came during the fifth pass when counsel renewed her motion to the prosecution's peremptory strikes, stating that the prosecutor exercised fourteen total strikes, eleven of which were against women. T. 357-358. The prosecutor noted that nine women were seated jurors, and the trial court again denied the defense's <u>Batson</u> motion. At the conclusion of the fifth pass, the prosecution and the defense had each used twelve of fifteen peremptory strikes against women.

At the beginning of alternate selection, counsel again renewed her <u>Batson</u> challenge, arguing that the number of strikes against women established a "clear pattern of striking women" by the prosecution. At this point, the prosecution had struck fifteen women out of seventeen peremptory strikes. The prosecutor observed that out of the twelve jurors sworn, seven were women. The trial court again denied the defense's motion. <u>Id.</u> at 363-364.

In the choosing of ten alternates, the prosecution used four peremptories against women, while the defense used three. <u>Id.</u> at 412-460. Counsel renewed her <u>Batson</u> motion a final time, stating that the prosecution had used, up to that point, a total of sixteen of the twenty-one peremptories against women. <u>Id.</u> at 456. The court denied that challenge. Ultimately, four women and six men were sworn as alternates, none of whom deliberated on petitioner's case.

## ii.  Applicable Case Law

"The Equal Protection Clause of the Constitution forbids the prosecutor to challenge potential jurors solely on account of their race." Batson v. Kentucky, 476 U.S. 79, 89 (1986). In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994), the Supreme Court held that the Equal Protection Clause also forbids use of peremptory challenges to exclude jurors solely because of their sex. In Batson, the Supreme Court established a "three-part test trial courts are to employ when evaluating whether a party exercised a peremptory challenge in a discriminatory manner." Galarza v. Keane, 252 F.3d 630, 635 (2d Cir. 2001). Under Batson and its progeny, "once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." Purkett v. Elem, 514 U.S. 765, 767 (1995).

The Second Circuit has recently articulated two patterns that can "give rise to an inference of discrimination." Jones v. West, 555 F.3d 90, 97-98 (2d Cir. 2009).

> The first, referred to as the "exclusion rate," measures whether "members of the . . . group are completely or almost completely excluded from participating on the jury". The second, referred to as the "challenge rate" measures whether "a party exercise[d] a

> disproportionate share of its total peremptory
> strikes against members of a cognizable . . .
> group compared to the percentage of the . . .
> group in the venire". To determine the
> "challenge rate," the record must indicate the
> number of peremptory challenges used against
> the group at issue, the total number of
> peremptory challenges exercised, and the
> percentage of the venire that belongs to the
> group.

People v. Wilson, 65 A.D.3d 956, 960 (1st Dept. 2009) (quoting

Jones, 555 F.3d at 98 and citing Johnson v. California, 545 U.S.

162 (2005)) (ellipses added).

As he did in the trial court and on direct appeal, petitioner

essentially alleges that the "challenge rate" against women

established a *prima facie* case of discrimination. Pet'r Mem. at 74.

The Second Circuit has made clear that "[o]nly a rate of minority

challenges significantly higher than the minority percentage of the

venire would support a statistical inference of discrimination."

United States v. Alvarado, 923 F.2d 253, 255-56 (2d Cir. 1991)

(finding that "a challenge rate nearly twice the likely minority

percentage of the venire strongly supports a prima facie case under

Batson ").

Here, the entire jury pool questioned during the third phase

of *voir dire* totaled seventy-eight; forty-five women (58%) and

thirty-three men (42%). At the time the twelfth juror was chosen

(after the fifth pass), the remaining pool included thirty-one

women (66%) and sixteen men (34%). Thus, at all times relevant to

petitioner's Batson challenges, women comprised the majority of the

jury pool.  During the fifth pass, defense counsel challenged the prosecutor's eleventh peremptory strike on the basis that eleven of fourteen peremptories had been used to strike women from the venire, resulting in a challenge rate of approximately 79%. However, that statistic by itself is insufficient to establish a *prima facie* case of discrimination, given that there were nearly twice as many women in the jury pool than men, constituting 66% of the jury pool at that time. See Brown v. Alexander, 543 F.3d 94, 101 (2d Cir. 2008) (a challenge rate of 88%, compared to a venire in which 63% of the members were African-Americans, did not support a *prima facie* case of discrimination).  Thus, that statistic alone need not have prompted the trial judge to proceed to the second step of the Batson inquiry in light of the total number of women in the venire and the number of sworn female jurors.  Moreover, there was nothing in the prosecutor's questions or statements during *voir dire* that supported an inference of discriminatory purpose. Batson, 476 U.S. at 97. The state court thus did not unreasonably apply clearly established Supreme Court precedent in determining that the defense's statistical argument did not meet petitioner's burden

under the first stage of the Batson inquiry.[8] This claim must therefore be dismissed.

## IV. Conclusion

For the reasons stated above, Jose J. Santiago's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the action is dismissed. Because petitioner has failed to make a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

SO ORDERED.

S/Michael A. Telesca

_____
MICHAEL A. TELESCA
United States District Judge

Dated:     November 10, 2010
           Rochester, New York

_____

[8] The threshold determination of whether a defendant has made a *prima facie* showing of discrimination requires the resolution of a mixed question of law and fact. United States v. Alvarado, 891 F.2d 439, 443 (2d Cir. 1989), vacated on other grounds by, 497 U.S. 543 (1990). Accordingly, a court reviewing such a determination in a habeas case must consider whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Overton v. Newton, 295 F.3d 270, 277 (2d Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1))